UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT L. DYKES, #201541,

                Plaintiff,

     v.

CORIZON, INC, et al.,

                Defendants.

_____/

Case No. 2:22-cv-113

Hon. Hala Y. Jarbou
Chief U.S. District Judge

## REPORT AND RECOMMENDATION

### I.    Introduction

This Report and Recommendation (R. & R.) addresses the motion for summary judgment filed by Defendants Bush, Dirschell, Wellman, and Willard. (ECF No. 66.)

Plaintiff – state prisoner Robert L. Dykes – filed suit pursuant to 42 U.S.C. § 1983 on May 27, 2022.  In his verified complaint, Dykes alleged that Defendants[1] violated his rights under the First and Eighth Amendments and the Religious Land Use and Institutionalized Persons Act (RLUIPA).   (ECF No. 1, PageID.5-14.) Specifically, Dykes complained that Defendants refused his requests for a religious diet free of soy, peanut butter, all beans other than navy beans, corn, corn bread,

---

[1]    Dykes initially named the following as Defendants: (1) Corizon, Inc. ("Corizon"), (2) Dr. Timothy Stallman, (3) Nurse Practitioner (NP) Wendy Jamros, (4) Nurse Manager Wendy Ball, (5) Dietician Kelly Wellman, (6) Dietician Patricia Willard, (7) Special Activities Coordinator (SAC) Steve Adamson, (8) SAC Adrian Dirschell, and (9) Michigan Department of Corrections (MDOC) Deputy Director Jeremy Bush.  (ECF No. 1, PageID.3-4.)

grits, and greens.  Dykes alleged both that his sincerely held religious beliefs as a member of the Moorish Science Temple of America required him to adhere to the aforementioned diet, and that the non-adherent diet caused him gastrointestinal distress and issues related to his glucose-6-phosphate dehydrogenase (G6PD) enzyme deficiency.

In a July 22, 2022, screening opinion, this Court determined that Dykes's complaint stated the following claims:

1. First Amendment claims for damages against Defendants Willard, Dirschell, and Bush in their <u>individual capacities</u>;

2. First Amendment and RLUIPA claims for injunctive relief against Defendants Willard, Dirschell, and Bush in their <u>official capacities</u>;

3. Eighth Amendment claims for damages against Defendants Stallman, Jamros, Wellman, Willard, Dirschell, and Bush in their <u>individual capacities</u>;

4. Eighth Amendment claims for injunctive relief against Defendants Willard, Dirschell, and Bush in their <u>individual and official capacities</u>; and

5. Eighth Amendment claims against Defendant Corizon.

(ECF No. 8, PageID.129-130.)

Defendants Bush, Dirschell, Wellman, and Willard – all of whom are or were MDOC employees – now move for summary judgment with respect to Dykes's claims against them.  (ECF No. 66.)  In short, Defendants say that Willard was not involved with Dykes's diet—she had never even heard of Dykes prior to this lawsuit.  (ECF

No. 67, PageID.558-559.)  Furthermore, none of the defendants had the authority to issue Dykes a therapeutic diet.  (*Id.*, PageID.564-567.)   Nor was Dietician Wellman involved in Dykes's religious dietary requests.  And though Defendant Dirschell considered Dykes's requests for an alternative religious diet and Defendant Bush denied them, Dirschell and Bush based their determinations on Dykes's continued purchase of foods that violated his alleged religious beliefs.  (*Id.*, PageID.569.)

In response, Dykes avers that all of the defendants were personally involved in his diet-related claims.  (ECF No. 69, PageID.657-659, 660-663.)  With respect to his Eighth Amendment claims, Dykes contends that his G6PD deficiency and his "gastrointestinal condition" constituted serious medical needs, and that Defendants reviewed his medical records, or had an obligation to review his medical records, and nevertheless denied Dykes's requests for an alternative diet.  (*Id.*, PageID.663-674.)  Turning to his religious claims, Dykes contends that his religious dietary beliefs are sincere, and that he only purchased non-conforming foods from the commissary for bartering purposes.  (*Id.*, PageID.660-662, 675-677.)

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment.  In the undersigned's opinion, there are no genuine issues of material fact with respect to Dykes's claims against the MDOC employees. The undersigned has reached the following conclusions:

1. Dykes's First and Eighth Amendment claims against Defendants
   Willard, Dirschell, and Bush in their <u>official capacities</u> fail because

Dykes did not allege that a policy or custom of the MDOC acted as a moving force behind the violation of his constitutional rights;

2. Dykes's <u>personal capacity</u> claims against Willard under the First and Eighth Amendment, and against Dirschell and Bush under the Eighth Amendment fail because the officials were not personally involved in the alleged violation of those rights;

3. Dykes's <u>personal capacity</u> Eighth Amendment claim against Wellman fails because the evidence on the record establishes that Wellman did not act with deliberate indifference to his dietary needs, but rather considered whether he was receiving adequate nutrition and counseled him on acclimating to a high-fiber diet;

4. Dykes's <u>personal capacity</u> First Amendment claims against Dirschell and Bush fail because their denial of his alternative diet was based on Dykes's history of purchasing foods that did not conform with his alleged religious beliefs, which was reasonably related to the penological interests of controlling costs and maintaining discipline; and

5. Dykes's RLUIPA claims against Defendants fail because the denial of his alternative diet request was not permanent, and therefore did not substantially burden the exercise of his religion.

## II.    Relevant Procedural History

On February 17, 2023, Defendant Corizon filed a notice of bankruptcy and automatic stay.  (ECF No. 33.)  There, Corizon explained that it had filed for

bankruptcy under Chapter 11 of Title 11 of the United States Code, triggering an automatic stay of proceedings against it.  (ECF No. 33, PageID.399 (citing 11 U.S.C. § 362(a)).)

On March 15, 2023, the Chapman Law Group (CLG), which had previously appeared on behalf of Defendants Stallman, Jamros, and Corizon, moved to withdraw as attorneys in this matter and for a 120-day stay.  (ECF No. 37.)  The Court initially denied the motion to withdraw without prejudice and granted a 90-day stay, requiring Defendants "to provide monthly status reports regarding their attempts to retain new counsel" and providing that "once new counsel is obtained, Defense Counsel [CLG] may refile its motion to withdraw as counsel."  (ECF No. 40, PageID.417.)  Following a status conference with the parties on July 11, 2023, the Court issued an order withdrawing CLG as attorneys for Defendants Stallman, Jamros, and Corizon, and declining to extend the 90-day stay.  (ECF No. 55, PageID.464.)  This case therefore proceeded with respect to all claims except for Dykes's claim against Corizon.

## III.    Relevant Factual Allegations

In his verified complaint, Dykes alleges that "for years" he has complained of gastrointestinal distress and "for years" Corizon has refused his requests for a soy, dairy, and bean-free diet, instead opting to prescribe him medication.  (ECF No. 1, PageID.5.)  In the same vein, Dykes alleges that since 2019, the MDOC has denied his requests for a religious diet free of soy, peanut butter, all beans other than navy beans, corn, corn bread, grits, and greens.  (*Id.*, PageID.5-6.)

5

### a. Gastrointestinal Issues and G6PD Deficiency

More specifically, Dykes alleges that while he was incarcerated at KCF on January 20, 2020, he sent a communication to health care complaining of diarrhea and vomiting. (*Id.*, PageID.6.) Dykes was later seen by Defendant NP Jamros. During that visit, Dykes explained that his diet was causing gastrointestinal distress, and that the medications he had been prescribed were not helping. Dykes asked for a diet free of soy, beans, and dairy. (*Id.*) Jamros allegedly responded that it was "not the policy or the practice of the provider to issue diets." According to Dykes, "the provider" that Jamros was referring to was Corizon. (*Id.*)

Dykes alleges that in April or May of 2020, he had a phone appointment with Dr. Stallman. He again reported that he was experiencing gastrointestinal distress including "extreme gas, stomach pain, diarrhea, and vomiting" from "soy, beans, and dairy." (*Id.*) Dr. Stallman allegedly responded that "the provider would not approve of a diet" but that he would prescribe Dykes a new medication.

Dykes sent health care another communication on September 11, 2020. (*Id.*) He again complained of gastrointestinal issues. Dykes says that he was scheduled for an appointment with healthcare, but that he missed the appointment for reasons beyond his control. (*Id.*) After he sent another communication to healthcare, Dykes was seen by Nurse Manager Bell. (*Id.*, PageID.7.) Again, Dykes explained his symptoms. Again, Dykes requested a "soy, bean, and dairy free diet." (*Id.*) Instead of scheduling Dykes for an appointment with Jamros or Stallman, Bell forwarded Dykes's complaints to Dietician Wellman.

6

Dykes says that Wellman misunderstood his complaints; Wellman assumed that Dykes was requesting a vegan diet. (*Id.*) Dykes informed Wellman that he was not asking for a vegan diet, he was asking for a diet free of soy and beans. Dietician Wellman responded that the "MDOC does not provide diet trays to accommodate individual food intolerances." (*Id.*)

In May of 2021, Dr. Stallman ordered bloodwork to determine what was causing Dykes's gastrointestinal symptoms and lethargy. That bloodwork revealed Dykes has a G6PD deficiency. (*Id.*) Dykes alleges that when he asked Dr. Stallman what he could do to manage the condition, Dr. Stallman told Dykes to "stay away from soy and beans." (*Id.*, PageID.7-8.) Dr. Stallman then provided him with an informational flier regarding G6PD deficiency, which similarly instructed him to avoid legumes. (*Id.*; ECF No. 1-12 (Informational Flier).)

### b. Religious Dietary Beliefs

Dykes next alleges that he has been a member of the Moorish Science Temple of America since 1991, and that he has been requesting a diet that comports with his religious dietary restrictions since 2016. (ECF No. 1, PageID.8.) As a member of the Moorish Science Temple of American, Dykes says that he sincerely believes that "Prophet Noble Drew Ali was Divinely prepared by the Great-God Allah." According to Dykes, "Prophet Noble Drew Ali did not bring . . . a dietary program, he left it up to the individual's own conscience." (*Id.*)

Dykes says that "[i]n 2011, based on [Dykes's] own conscience, [he] studied and adopted the Buddhist diet, which prohibited the eating/killing of any living thing,

meat by-products or dairy." (*Id.*, PageID.9.)  In 2015, Dykes says that he read and studied the first and second volumes of "How to Eat to Live" by Elijah Muhammad and adopted the Nation of Islam diet.  Dykes says that he notified the MDOC of his choice throughout 2016, 2017, 2018, and 2019, and explained that he was prohibited from eating "soy, peanut butter, all beans (except navy beans), corn, corn bread, grits and greens." (*Id.*)

In 2019, Dykes says that he was called out by a non-party chaplain, who interviewed Dykes about his religious beliefs.  Dykes was subsequently placed on the vegan religious diet by SAC Adamson.  (*Id.*, PageID.10.)  Dykes immediately noticed that the vegan diet included soy, beans, greens, corn, peanut butter, and corn bread, all of which violated his religious dietary beliefs.  Because MDOC policy only allowed a prisoner to request a religious meal once per year, Dykes says that he waited a year before requesting an alternative diet.  (*Id.*)

Dykes requested an alternative diet on October 21, 2020.  Once again, Dykes was interviewed by a non-party chaplain.  And once again, he explained that his religious beliefs precluded him from eating soy, beans other than navy beans, peanut butter, corn, corn bread, grits, and greens.  (*Id.*)  Dykes says that this request was submitted to SAC Dirschell, who issued a recommendation to Deputy Director Bush. On May 3, 2021, Bush denied Dykes's request without explanation.  (*Id.*, PageID.11.)

Dykes says that at some point prior to the denial of his alternative diet request, he was called out by the chaplain, who accused Dykes of purchasing foods that violated his alleged religious beliefs.  Dykes explained that he had purchased the food

for bartering purposes.  (*Id.*)  Dykes was warned that prisoners are not permitted to maintain a vegan religious diet while purchasing meat products.

On February 1, 2022, Dykes submitted another request for an alternative menu to another non-party chaplain.  (*Id.*)  Once again, the request was sent to SAC Dirschell, and then Deputy Director Bush.  On March 22, 2022, Bush again denied Dykes's request without explanation.  (*Id.*)

## IV.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.    Analysis

Dykes's claims center around his alleged religious and medical dietary needs. In analyzing these claims, it is helpful to understand the MDOC policies and procedures surrounding religious and therapeutic diets.

The administration of religious diets is governed by MDOC Policy Directive 05.03.150: *Religious Beliefs and Practices of Prisoners* (effective Oct. 1, 2019).  The MDOC employs a universal vegan religious diet.  MDOC Policy Directive 05.03.150 at ¶ OO.  The diet conforms to both Kosher and Halal religious tenets.  *Id.*  It provides at least 2,600 calories and 90 grams of protein per day.  (ECF No. 67-2, PageID.578 (Wellman Decl.).)  Because the vegan religious diet is high in fiber, it is not uncommon for individuals on the diet to experience digestive distress or discomfort.  (*Id.*, PageID.578-579.)

There are two avenues through which an individual on the religious diet may obtain an alternative diet.  First, if the vegan religious diet does not conform to an individual's religious dietary beliefs, they may obtain an alternative diet from the Deputy Director of the MDOC.  MDOC Policy Directive 05.03.150 at ¶ OO.  Second, if the individual has a medical condition resulting in inadequate nutrition, a medical provider (physician, physician assistant, or nurse practitioner) may order a therapeutic diet; the administration of therapeutic diets is governed by MDOC Policy Directive 04.07.101: *Therapeutic Diet Services* (effective Sept. 1, 2018).  While therapeutic diets may be ordered based on an individual's medical needs, they are not "ordered or modified to accommodate personal preferences."  *Id.* at ¶ E.

10

The Special Activities Coordinator helps the Deputy Director determine whether an alternative diet is necessary to conform to an individual's religious dietary beliefs.  (ECF No. 67-3, PageID.583 (Dirschell Aff.).)  When a medical provider orders a therapeutic diet, a registered dietician reviews the order to ensure that it is appropriate, and to make recommendations with respect to the therapeutic diet. MDOC Policy Directive 04.07.101 at ¶ G.

Dykes alleges that he required dietary accommodations due to both his medical needs and religious beliefs.  He therefore asserts that any denial of dietary accommodations constituted deliberate indifference to his serious medical needs in violation of the Eighth Amendment, and a violation of his religious rights under the First Amendment and RLUIPA.

### a. Eighth Amendment Deliberate Indifference—Personal Capacity

Dykes first avers that by denying his request for an alternative diet, Defendants acted with deliberate indifference to: (1) the gastrointestinal distress he experienced as a result of the soy and fiber in the vegan religious diet, and (2) his G6PD deficiency.

As an initial matter, the evidence on the record establishes that Dietician Willard, SAC Dirschell, and Deputy Director Bush were not involved in Dykes's medical care and had no authority to order a therapeutic diet based on Dykes's medical needs.  For a state actor to be held personally liable under § 1983, they must have been personally involved in the violation of the plaintiff's rights.  *Miller v.*

*Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005); *Bennett v. Schroeder*, 99 F. App'x 707, 713-714 (6th Cir. 2004).

Dietician Willard never met Dykes; she was not aware that Dykes existed prior to this lawsuit. (ECF No. 67-4, PageID.608 (Willard Decl.).) Furthermore, while Dykes complains that Willard created a vegan religious diet that was high in fiber, knowing it could lead to gastrointestinal distress, MDOC Policy Directive 04.07.101 sets forth a procedure for prisoners in need of a therapeutic diet. That procedure is wholly separate from Willard's creation of the vegan religious diet. Willard had no input as to whether Dykes should have been placed on a therapeutic diet based on his gastrointestinal distress or G6PD deficiency. (ECF No. 67-4, PageID.608.)

Turning to SAC Dirschell and Deputy Director Bush, the evidence on the record establishes that when an individual requests an alternative diet from the Deputy Director, the SAC and Deputy Director are concerned only with the individual's sincere religious beliefs. (ECF No. 67-3, PageID.583-585 (Dirschell Aff.), 589 (Apr. 28, 2021, Denial), 605 (Feb. 17, 2022, Denial).) In other words, the SAC does not base his recommendation, and the Deputy Director does not base his decision, on the medical needs of the individual requesting the alternative diet. It is purely a question of religious beliefs. *See* MDOC Policy Directive 05.03.150 at ¶ OO ("An alternative menu will be developed and provided . . . only if it is determined that the Vegan menu does not meet the *religious* dietary needs of the prisoner.").

Thus, the only Defendant joined in the present motion for summary judgment who was arguably involved in Dykes's requests for a therapeutic diet was Dietician

Wellman, who considered his diet-related medical complaints in October of 2020. Dietician Wellman reviewed Dykes's medical records and noted that, despite his gastrointestinal complaints, there was no indication for a therapeutic diet. (ECF No. 1, PageID.7; ECF No. 67-2, PageID.579 (Wellman Decl.).)   The undersigned acknowledges that regardless of Dietician Wellman's evaluation, she did not have the authority to order a therapeutic diet; that authority rested solely with Dykes's medical providers.  (ECF No. 67-2, PageID.578); *see also* MDOC Policy Directive 04.07.101 at ¶ G.  But even assuming that Dietician Wellman's review of Dykes's medical records and determination that there was indication for a therapeutic diet is sufficient to establish personal involvement for the sake of Dykes's deliberate indifference claim, the undersigned finds that there are no genuine issues of material fact, and that Dietician Wellman was not deliberately indifferent to Dykes's serious medical needs.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

13

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment.  *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir.

2004) (reiterating that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate treatment).

The subjective component of a deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*; *see also Estelle*, 429 U.S. at 105-06 ([A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. Differences in judgment between inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

Dykes complains that the soy, beans, and dairy[2] in the vegan religious meal caused him to experience "extreme gas, stomach pain, diarrhea, and vomiting." (ECF No. 1, PageID.6.)  In January of 2020, Dykes says that he notified health care that the medication they were giving him to treat his gastrointestinal issues was not working.  In May of 2020, Dr. Stallman indicated that he would prescribe Dykes a new medication.  (*Id.*)  After his symptoms persisted on the new medication, Dykes again complained to health care in September of 2020.  This time, Dykes says that health care referred him to Dietician Wellman.  (*Id.*, PageID.7.)  In October of 2020, Wellman told Dykes that the "MDOC does not provide diet trays to accommodate individual food intolerances."  (*Id.*)

Courts are generally reluctant to find that occasional gastrointestinal symptoms alone may constitute a sufficiently serious medical need.  *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition."); *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (finding that the plaintiff failed to produce sufficient evidence that his alleged stomach disorders constituted serious medical needs); *Smith v. Hepp*, No. 18-CV-669-JDP, 2022 WL 1001183 (W.D. Wis. Apr. 4, 2022) ("Stomach distress often is not

---

[2]    The MDOC's universal religious meal is vegan.  But Dykes believed that the bread and salad dressing he was served as a part of the religious meal contained dairy.  (ECF No. 1, PageID.6.)

serious enough to support an Eighth Amendment claim" (citing *Riley El v. Godinez*, No. 13-c-5768, 2016 WL 4505038, at *11 (N.D. Ill. Aug. 29, 2016))).

Accordingly, courts have rejected deliberate indifference claims based on food intolerances marked by simple gastrointestinal distress. *Middlebrook v. Wellman*, No. 2:21-CV-208, 2023 WL 2465551, at *9 (W.D. Mich. Jan. 3, 2023) (finding that the plaintiff's alleged soy intolerance, which caused "dizziness, cramps, headaches, nausea, diarrhea, and a loss of appetite" did not constitute a serious medical need where there was no evidence of malnutrition), *R. & R. adopted*, No. 2:21-CV-208, 2023 WL 1431961 (W.D. Mich. Feb. 1, 2023); *Brady v. Wexford Health Sources, Inc.*, No. 3:17-CV-883-MAB, 2021 WL 4262430 (S.D. Ill. Sept. 20, 2021) (finding no evidence that a plaintiff's "severe gas and constipation," which the plaintiff believed to be a result of consuming soy, constituted a serious medical need); *Ybarra v. Meador*, No. 9:09CV213, 2012 WL 12986185, at *9 (E.D. Tex. Jan. 12, 2012) (finding that the plaintiff had not provided sufficient evidence of a serious medical need where his medical records demonstrated that he had a food intolerance, not a food allergy), *R. & R. adopted*, No. 9:09CV213, 2012 WL 12986183 (E.D. Tex. June 5, 2012).

To be fair, Dykes also alleges that he suffered from a glucose-6-phosphate dehydrogenase (G6PD) deficiency. Dykes provides little in the way of evidence that this deficiency constitutes a serious medical need related to his diet. However, Dykes provided the informational flier that his doctor allegedly gave him after determining that Dykes had a G6PD deficiency. (ECF No. 1-12.) That particular flier notes that individuals with a G6PD deficiency experience hemolytic anemia when they are

exposed to certain chemicals. (*Id.*, PageID.68.) Hemolytic anemia "is the decreased ability of red blood cells to transport oxygen throughout the body." (*Id.*) According to the flier, one thing that causes hemolytic anemia in individuals with a G6PD deficiency is fava beans. (*Id.*, PageID.70.) Indeed, consuming fava beans may be fatal to a person with a G6PD deficiency. But the flier further suggests that a number of foods may cause low-level hemolysis, which may not result in hospitalization but may result in "memory dysfunction, over worked spleen, liver and heart, and iron overload" over time. (*Id.*) Among the foods that may cause low-level hemolysis are legumes—including soybeans. (*Id.*, PageID.70,72.)

Ultimately, the undersigned is not convinced that Dykes has created a genuine issue of material fact as to whether his gastrointestinal distress or G6PD deficiency, either alone or together, constitute serious medical needs. But even assuming that he has, the evidence on the record establishes that Dietician Wellman was not deliberately indifferent to the conditions.

Dykes alleges, and Dietician Wellman confirms, that Dietician Wellman reviewed his diet-related complaints in October of 2020. Dietician Wellman says that at the time, she reviewed Dykes's medical and dietary history and considered whether a therapeutic diet was indicated. (ECF No. 67-2, PageID.579.) Notably, that medical and dietary history included Dykes's alleged gastrointestinal distress, but could not have included Dykes's G6PD deficiency, as Dykes says that he was diagnosed with the deficiency in May of 2021. (ECF No. 1, PageID.7.) Thus, Wellman was not aware

of, and could not have acted with deliberate indifference to, Dykes's enzyme deficiency.[3]  *Farmer*, 511 U.S. at 837.

With respect to Dykes's alleged gastrointestinal issues, Dietician Wellman notes that the vegan diet is a high-fiber diet, and that gastrointestinal discomfort is not uncommon.  (ECF No. 67-2, PageID.579.)  Nevertheless, she looked for any signs that Dykes was receiving inadequate nutrition on the vegan diet and found that there were none.  In fact, Dykes had gained weight since starting the vegan diet.  (*Id.*)  Dietician Wellman therefore explained to Dykes that the vegan diet is high in fiber, and that he did not have a medical need for a therapeutic diet.  (ECF No. 1-1, PageID.66.)  She further recommended that Dykes "try[] smaller portions of the foods that are triggering [his] symptoms to see if [he] can find a tolerable threshold, and ensur[e] that [he is] drinking plenty of water throughout the day which can help with the digestion of a high fiber diet."  (*Id.*)

In the undersigned's opinion, Dietician Wellman's actions do not display deliberate indifference to Dykes's serious medical needs.  Dietician Wellman considered Dykes's complaints and medical history despite the fact that a medical provider had not ordered a therapeutic diet.  She determined that Dykes was receiving adequate nutrition, and that his symptoms were likely a normal response

---

[3]      In his response to Defendants' motion for summary judgment, Dykes asserts for the first time that he sent Dietician Wellman a request for a therapeutic diet based on his G6PD condition in June of 2021.  (ECF No. 69, PageID.656.)  Dykes indicates that he made a sworn statement to this effect in the declaration attached to his response, but he did not.  (*See* ECF No. 69-1, PageID.683.)  Nor is the alleged request a part of the record.  Because the allegation was not made in verified statement, the allegation does not create a genuine issue of fact.

to the high-fiber vegan diet.  She therefore provided Dykes with recommendations on how to better manage a high-fiber diet.  At most, Dykes has established that he disagreed with Dietician Wellman's evaluation.  But, as set forth above, a mere disagreement in judgment does not establish that Dietician Wellman acted with deliberate indifference.  *Sanderfer*, 62 F.3d at 154-55; *Ward*, 1996 WL 627724, at *1.

In sum, it is the undersigned's opinion that that there are no genuine issues of material fact with respect to Dykes's Eighth Amendment claim against Defendants in their personal capacities.  Defendants Willard, Dirschell, and Bush were not personally involved with the denial of Dykes's *therapeutic* diet requests.  And Dietician Wellman did not act with deliberate indifference to Dykes's serious medical needs.  As such, the undersigned recommends that the Court grant Defendants summary judgment as to this claim.

### b.  Eighth Amendment Deliberate Indifference—Official Capacity

In addition to suing Dietician Willard, SAC Dirschell, and Deputy Director Bush in their personal capacities for violating his Eighth Amendment rights, Dykes sues these actors in their official capacities for injunctive relief.

"Official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n. 55 (1978).  The first inquiry in evaluating such a claim is whether the entity had a policy or custom.  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996).  The policy or custom must be the moving force behind the constitutional injury. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir.

2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508–09.

"To show the existence of a . . . policy or custom leading to the alleged violation, a

plaintiff can identify: (1) the [entity]'s legislative enactments or official policies; (2)

actions taken by officials with final decision-making authority; (3) a policy of

inadequate training or supervision; or (4) a custom of tolerance or acquiescence of

federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).

Defendants Willard, SAC Dirschell, and Deputy Director Bush work for the

MDOC.  In the undersigned's opinion, Dykes's complaint does not allege that an

MDOC policy or custom served as the moving force behind the violation of his Eighth

Amendment rights.  At one point, Dykes complains that Defendant Wellman

informed him that the "MDOC does not provide diet trays to accommodate individual

food intolerances." (ECF No. 1, PageID.7.)  But Dykes's complaint seemed to be that

he experienced more than a simple food intolerance, not that the MDOC's policy or

custom of declining to accommodate individual food intolerances was the moving force

behind a violation of his Eighth Amendment rights.  (*Id.* ("Ms. Wellman ignored the

fact that I was on medication for the symptoms.").)  Furthermore, Dykes explicitly

alleged that it was Corizon, not the MDOC, that had a policy or custom of denying

therapeutic diets.  (*Id.*, PageID.13.)

In sum, Dykes's Eighth Amendment claim against Defendants Willard, SAC

Dirschell, and Deputy Director Bush in their official capacities acts as a claim against

the entity they work for: the MDOC.  Because Dykes does not allege that an MDOC

policy or custom acted as the driving force behind the violation of his Eighth Amendment rights, the undersigned recommends that the Court grant Defendants summary judgment as to this claim.

### c.  First Amendment Free Exercise and RLUIPA

Dykes further avers that by denying his request for an alternative diet, Dietician Willard, SAC Dirschell, and Deputy Director Bush violated his religious rights under the Free Exercise Clause and RLUIPA.

### i.  Free Exercise—Personal Capacity

As an initial matter, Dykes's personal capacity free exercise claim against Dietician Willard suffers from the same flaws as his deliberate indifference claim against Dietician Willard.  That is, Dietician Willard was not personally involved in Dykes's request for an alternative diet based on Dykes's religious needs.  Once again, Dietician Willard never met Dykes; she was not aware that Dykes existed prior to this lawsuit.  (ECF No. 67-4, PageID.608.)  Furthermore, although Dykes complains that Willard created the vegan religious diet, MDOC Policy Directive 05.03.150 sets forth a procedure for prisoners whose religious dietary needs are not met by the vegan religious diet.  That procedure is wholly separate from Willard's creation of the vegan religious diet.  Willard had no input as to whether Dykes should have been placed on an alternative diet based on his specific religious beliefs.  (*Id.*)

Thus, the only Defendants joined in the present motion for summary judgment who were arguably personally involved in Dykes's requests for an alternative religious diet were SAC Dirschell, who considered Dykes's requests for an alternative

religious diet and recommended that they be denied, and Deputy Director Bush, who ultimately denied Dykes's requests.  The undersigned acknowledges that regardless of SAC Dirschell's recommendation, he did not have the authority to grant or deny a request for an alternative diet; that authority rested solely with Deputy Director Bush.  (ECF No. 67-3, PageID.583 (Dirschell Aff.)); *see also* MDOC Policy Directive 05.03.150 at ¶ OO.  But even assuming that SAC Dirschell's recommendation is sufficient to establish personal involvement for the sake of Dykes's First Amendment claim, the undersigned finds that there are no genuine issues of material fact, and that neither SAC Dirschell nor Deputy Director Bush violated Dykes's free exercise rights.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend I.  The right to freely exercise one's religion is applicable to the States through the Fourteenth Amendment.  *See Cantwell v. Conn.*, 310 U.S. 296, 303 (1940).

To establish that this right has been violated, each plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) defendant's behavior infringes upon this practice or belief.  *See Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001).

The Supreme Court has observed that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also Turner v. Safley,* 482 U.S. 78, 84

(1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Thus, while "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates nevertheless retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). But "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Wolfish*, 441 U.S. at 545. Operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

When reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights. *See Turner*, 482 U.S. at 85. The standard by which this balancing occurs was articulated by the *Turner* Court, which held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard represents a "'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Flagner*, 241 F.3d at 481 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).

The *Turner* Court identified four factors as relevant in determining the reasonableness of a challenged prison regulation:

1. whether there is a rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2. whether there are alternative means of exercising the right that remain open to prison inmates;

3. whether accommodating the alleged right would have an undue impact on guards and other inmates, or the allocation of prison resources generally; and

4. whether there are ready alternatives available that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests.

*Turner*, 482 U.S. at 89-91.

Defendants bear the initial burden of articulating a valid, rational connection between the challenged action and the legitimate governmental interest that motivated it. This burden is "slight, and in certain instances, the connection may be a matter of common sense." *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012). If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484. The *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91. Instead, the issue

is simply whether the policy at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484.

At the outset, the undersigned notes that there is a dispute as to the sincerity of Dykes's religious dietary beliefs. Dykes alleges that Prophet Noble Drew Ali of the Moorish Science Temple of America left dietary matters to individual conscience. (ECF No. 1, PageID.8.) Dykes adopted the Nation of Islam diet and, after reading both volumes of "How to Eat to Live" by Elijah Muhammad, adopted an even more restrictive diet free of soy, peanut butter, all beans other than navy beans, corn, corn bread, grits, and greens. (*Id.*, PageID.9.) It is not clear from the record whether the restrictions Dykes adopted from "How to Eat to Live" are religious in nature, health-conscious in nature, or both.[4] Furthermore, Dykes's commissary records reflect many purchases contrary to Dykes's alleged religious dietary beliefs. (ECF No. 67-3, PageID.587-588, 598-603.) But ultimately, the sincerity of Dykes's religious dietary beliefs is a question of fact that this Court cannot resolve at the summary judgment stage. *United States v. Seeger*, 380 U.S. 163, 185 (1965). Be that as it may, it is the undersigned's opinion that the sincerity of Dykes's religious dietary beliefs is immaterial under the circumstances presented.

Even assuming that Dykes's religious dietary beliefs are sincere, there is no dispute as to Defendants' justification for denying Dykes's request for an alternative

---

[4]     Of course, a prison is not required to consider an accommodation for a religious individual's "purely secular" beliefs. *Bennett v. Burt*, No. 1:16-CV-1203, 2016 WL 7034240, at *3 (W.D. Mich. Dec. 2, 2016) (first quoting *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991); then citing *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999); and then citing *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987))

religious diet; although Dykes reported that his sincerely held religious beliefs prohibited him from consuming soy, peanut butter, all beans other than navy beans, corn, corn bread, grits, and greens, Dykes's commissary records revealed that he regularly purchased non-conforming foods.  (ECF No. 67-3, PageID.589, 605.)  Dykes admits to these purchases but says that he bought the foods for bartering purposes, and that he never consumed them.  (ECF No. 1, PageID.12; ECF No. 69, PageID.661.) Defendants point to a medical record suggesting that Dykes consumed the non-conforming food on at least one occasion (ECF No. 67-5, PageID.614), but Dykes avers that the record is inaccurate (ECF No. 69-1, PageID.683).

Whether Dykes in fact consumed the non-conforming food that he purchased is irrelevant.  This Court has consistently determined that "[i]t is reasonable for prison officials to deny special religious diets to prisoners who consume *or purchase* food which is inconsistent with the requested religious diet."  *O'Connor v. Leach*, No. 1:18-CV-977, 2020 WL 838084, at *3 (W.D. Mich. Jan. 27, 2020) (emphasis added) (quoting *Berryman v. Granholm*, 343 F. App'x 1, 6 (6th Cir. 2009)), *R. & R. adopted*, No. 1:18-CV-977, 2020 WL 2187814 (W.D. Mich. May 6, 2020); *see also Ewing v. Finco*, No. 1:17-CV-505, 2019 WL 8105992, at *8 (W.D. Mich. Sept. 18, 2019) (quoting *Perreault v. Mich. Dep't of Corr.*, No. 1:16-cv-1447, 2018 WL 3640356, at *3 (W.D. Mich. Aug. 1, 2018)), *R. & R. adopted*, No. 1:17-CV-505, 2019 WL 6485869 (W.D. Mich. Dec. 3, 2019).[5]  Indeed, multiple legitimate penological interests justify this

---

[5]     As a part of his complaint, Dykes alleges that he was "never placed on notice that the store purchases would be considered in obtaining approval for an alternative menu."  (ECF No. 1, PageID.12.)  But Dykes was one of the plaintiffs in *Ewing*. *See*

27

practice.  The MDOC has a legitimate interest in controlling costs, and religious meals are expensive.  *See O'Connor*, 2020 WL 838084, at *3 (citing *Green v. Tudor*, 685 F.Supp.2d 678, 698 (W.D. Mich. 2010)); *Perreault*, 2018 WL 3640356, at *3 (same).  Furthermore, the MDOC has a legitimate interest in maintaining discipline within the prison, and "[p]ermitting a prisoner to participate in a religious diet program when he is consuming or purchasing food in violation of the tenets of his stated religion could negatively impact prison security as such could cause resentment among prisoners who adhere to their faith's dietary restrictions." *O'Connor*, 2020 WL 838084, at *3; *see also Ewing*, 2019 WL 8105992, at *9 (quoting *Perreault*, 2018 WL 3640356, at *3).  Accordingly, in the undersigned's opinion, Defendants have satisfied the first *Turner* factor.  The undersigned now turns to the remaining *Turner* factors.

In the undersigned's opinion, these factors together weigh in Defendants' favor.  On one hand, soy, beans, and peanut butter are staples of the vegan religious menu.  (*See* ECF No. 1-16 (June 2018 Religious/Vegan Menu).)  It therefore appears the Dykes cannot rely on vegan religious meals alone to provide him with adequate nutrition while observing his alleged religious dietary beliefs.  But on the other hand, Dykes can supplement his vegan meals with food from the commissary that adheres

---

*Ewing*, No. 1:17-CV-505, 2019 WL 8105992, at *6.  There, the Court granted summary judgment as to his First Amendment claim that he had been denied a vegan religious meal in part because it found that it was reasonable for the defendants to deny his request based on his commissary purchases.  *Id.* at *8.  Furthermore, Dykes alleged in his complaint that prior to May of 2021, a chaplain called on him to discuss his commissary purchases and warned him that his vegan religious meals would be terminated if he continued to purchase meat products.  (ECF No. 1, PageID.11.)

to his beliefs.  And Dykes admits that he can reapply for an alternative diet once per year; the denial of his request was not permanent. *Ewing*, 2019 WL 8105992, at *9; *Perreault*, 2018 WL 3640356, at *3.

Furthermore, approving inmates for individualized religious diets while allowing them to purchase non-conforming foods from the commissary without consequence would significantly impact the allocation of prison resources.  *See Berryman*, 343 F. App'x at 6.  And Dykes does not point to a ready alternative that would accommodate his rights at a *de minimis* cost to valid penological interests.  *Id.* Accordingly, the undersigned recommends that the Court grant Defendants summary judgment as to this claim.

### ii. First Amendment—Official Capacity

In addition to suing Dietician Willard, SAC Dirschell, and Deputy Director Bush in their personal capacities for violating his First Amendment rights, Dykes sues the actors in their official capacities for injunctive relief.  Once again, Dykes's claim against Willard, Dirschell, and Bush in their official capacities is effectively a claim against the MDOC.  *Monell*, 436 U.S. at 690 n. 55.

In the undersigned's opinion, Dykes's complaint does not allege that an MDOC policy or custom served as the moving force behind the violation of his First Amendment rights.  *Turner*, 412 F.3d at 639; *Alkire*, 330 F.3d at 815; *Doe*, 103 F.3d at 508-09.  But even if Dykes's complaint could be construed as alleging that the MDOC's policy or custom of denying or discontinuing religious meals based on an

individual's commissary purchases[6] led to the violation of his First Amendment rights, it is the undersigned's opinion, for the reasons set forth above, that it did not. *See supra* pages 26-29. As such, the undersigned recommends that the Court grant Defendants summary judgment as to this claim.

### iii. RLUIPA

Dykes finally asserts an RLUIPA violation against Defendants Willard, Dirschell, and Bush in their official capacities based on the denial of his alternative diet requests.

In relevant part, the RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7).

While the phrase "substantial burden" is not defined in the RLUIPA, courts have concluded that a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729,

---

[6]    *See* MDOC Policy Directive 05.03.150 at ¶ SS (explaining that if a prisoner receiving a religious meal is found to have possessed or consumed food violating a tenet of their religion on more than one occasion, their approval for a religious meal will be rescinded for at least sixty days).

733-34 (6th Cir. 2007) (citations omitted); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).  Similarly, if a policy requires a petitioner to "engage in conduct that seriously violates [his] religious beliefs" or face disciplinary action, then the burden is substantial.  *Hobbs*, 574 U.S. at 361 (quoting *Hobby Lobby*, 573 U.S. at 720).  The fact that the plaintiff can engage in other forms of religious exercise is not relevant to whether the burden is substantial.  *Id.*

The Court's analysis of Dykes's RLUIPA claim parallels its analysis of his First Amendment free exercise claim.  Once again, this Court notes that the denial of Dykes's request for an alternative diet was not permanent, and that Dykes could reapply after a year.  This Court has previously determined that the temporary denial of an individual's participation in a religious meal program does not constitute a substantial burden on their religious exercise. *O'Connor*, 2020 WL 2187814, at *2 (collecting cases); *Ewing*, 2019 WL 8105992, at *10 (citing *Ketzner v. Williams*, No. 4:06-CV-73, 2008 WL 4534020, at *26 (W.D. Mich. Sept. 30, 2008)); *Perreault*, 2018 WL 3640356, at *4 (same).  And the Court has found that even if such a denial constituted a substantial burden, the MDOC policy of denying meal requests when an individual has purchased non-conforming food from the commissary constitutes the least restrictive means of furthering compelling governmental interests. *Perreault*, 2018 WL 3640356, at *4.  Accordingly, the undersigned recommends that the Court grant Defendants summary judgment as to this claim.

## VI.    Qualified Immunity

Defendants conclude their motion for summary judgment by asserting they are entitled to qualified immunity.  (ECF No. 67, PageID.572.)   Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).  As explained by the Court in *Pearson v. Callahan*, a qualified immunity analysis involves two determinations: (1) "whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right," and (2) "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The Court may make these determinations in either order.  *Id.* at 236.

Defendants' argument for qualified immunity is largely redundant.  After initially arguing that they are entitled to judgment because they did not violate Dykes's rights under the First Amendment, Eighth Amendment, or RLUIPA, they argue that they are entitled to qualified immunity because they did not violate Dykes's rights under the First Amendment, Eighth Amendment, or RLUIPA.  In other words, Defendants do not contend that the rights at issue were not clearly established at the time of their alleged misconduct.  In any event, the undersigned

agrees; because it is the undersigned's opinion that there are no genuine issues of material fact and that Defendants did not violate Dykes's rights under the First Amendment, Eighth Amendment, or RLUIPA, it is the undersigned's opinion that Defendants are entitled to qualified immunity.

## VII.    Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment (ECF No. 66).  In the undersigned's opinion, there are no genuine issues of material fact with respect to Dykes's claims against the MDOC employees.  The undersigned has reached the following conclusions:

1. Dykes's First and Eighth Amendment claims against Defendants Willard, Dirschell, and Bush in their <u>official capacities</u> fail because Dykes did not allege that a policy or custom of the MDOC acted as a moving force behind the violation of his constitutional rights;

2. Dykes's <u>personal capacity</u> claims against Willard under the First and Eighth Amendment, and against Dirschell and Bush under the Eighth Amendment fail because the officials were not personally involved in the alleged violation of those rights;

3. Dykes's <u>personal capacity</u> Eighth Amendment claim against Wellman fails because the evidence on the record establishes that Wellman did not act with deliberate indifference to his dietary needs, but rather considered whether he was receiving adequate nutrition and counseled him on acclimating to a high-fiber diet;

4. Dykes's <u>personal capacity</u> First Amendment claim against Dirschell and Bush fails because their denial of his alternative diet was based on Dykes's history of purchasing foods that did not conform with his alleged religious beliefs, which was reasonably related to the penological interests of controlling costs and maintaining discipline; and

5. Dykes's RLUIPA claim against Defendants fails because the denial of his alternative diet request was not permanent, and therefore did not substantially burden the exercise of his religion.

If the Court accepts this recommendation, Dykes's Eighth Amendment claim for damages against Defendants Stallman and Jamros and his Eighth Amendment claim against Corizon will remain.

Dated:  February 7, 2024

/s/ *Maarten Vermaat*
MAARTEN VERMAAT
U. S. MAGISTRATE JUDGE

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C) Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).