UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT L. DYKES,

       Plaintiff,

v.

       Case No. 2:22-cv-113

CORIZON, INC., et al.,

       Hon. Hala Y. Jarbou

       Defendants.

_____/

## **OPINION**

Robert L. Dykes, a state prisoner, brings this § 1983 action against several defendants alleging violations of his rights under the First Amendment, the Eighth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA).  His claims center on the diet provided to him by the Michigan Department of Corrections ("MDOC").  Specifically, Dykes alleges that Defendants refused his requests for a diet free of soy, peanut butter, corn, corn bread, grits, greens, and all beans other than navy beans.  He claims that this refusal violated his religious rights because the requested diet is part of his sincerely held religious beliefs.  He also claims that this refusal amounted to deliberate indifference of his medical needs because of a medical condition that prevented him from safely digesting the MDOC-provided diet.

Seven Defendants remain in this case:  Dr. Timothy Stallman, Nurse Practitioner Wendy Jamros, Dietician Kelly Wellman, Dietician Patricia Willard, Special Activities Coordinator Adrian Dirschell, MDOC Deputy Director Jeremy Bush, and Corizon, Inc ("Corizon").  The claims against Corizon are currently stayed for bankruptcy proceedings (ECF No. 33).  Before the Court are several motions and several Reports and Recommendations ("R&R").

Defendants Wellman, Willard, Dirschell, and Bush have filed a motion for summary judgment (ECF No. 66).  On February 7, 2024, Magistrate Judge Maarten Vermaat issued an R&R recommending that the Court grant their motion for summary judgment and dismiss each individual from the case (ECF No. 83).  Dykes has filed several objections to that report (ECF No. 86), to which Defendants have responded (ECF No.  89).

Defendant Jamros also moves for summary judgment (ECF No. 64).  On March 12, 2024, the magistrate judge issued an R&R recommending that the Court deny Jamros's motion (ECF No. 88).  Jamros has filed an objection to that report (ECF No. 90).

Finally, Dykes has filed a motion for default judgment as to Defendant Stallman (ECF No. 79).  On February 5, 2024, the magistrate judge issued an R&R recommending that the Court deny Dykes's motion (ECF No. 82).  Dykes objects to that recommendation (ECF No. 87).

## I. STANDARD

### A. R&R Review Standard

Under Rule 72 of the Federal Rules of Civil Procedure,

> the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

Because Wilson is proceeding pro se, this Court will construe his objections more liberally.

*See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

### B. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Further, summary judgment on affirmative defenses is appropriate.  *Speedeon Data, LLC v. Integrated Direct Marketing, LLC*, 718 F. App'x 333, 337 (6th Cir. 2017).   "For an affirmative defense, the defendant has the burden to show that it is entitled to the defense."  *Id.*

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## II. RELEVANT FACTS

In his complaint, Dykes alleges the following:

For year[s] I have complained of Gastro-intestinal (Extreme gas, stomach pain, diarrhea, and committing), for years [Defendants] ha[ve] addressed the issues with pharmaceuticals over my requests for soy, dairy, and beans free diet; Since 2019, the MDOC has denied my requests for a diet that comports to my sincerely held religious dietary beliefs, which consists of a soy-free diet, at no time has the MDOC offered me, or approved an alternative diet, as a result I have been deprived of my rights to exercise or practice my sincerely held religious beliefs.

(Compl. 5-6, ECF No. 1.)  He pursued his request for an alternative diet through two tracks—one medical and one religious.

### A. Medical Issues

In January 2020, Dykes sent a medical kite complaining of diarrhea and vomiting.  (Compl. ¶ 22.)  Defendant Jamros examined Dykes, and Dykes informed Jamros that the medications he was previously prescribed for his gastrointestinal issues were not working.  He felt that his issues were diet-related and thus could only be resolved by a change in diet.  He thus requested an

alternative diet.  Jamros refused his request because "[i]t is not the policy or practice of the provider to issue diets."  (*Id.* ¶ 23.)

A few months later, in April or May 2020, Dykes had a phone conference with Defendant Stallman.  (*Id.* ¶ 24.)  The result of this conversation was the same as with Jamros—Stallman refused Dykes's alternative diet request because "the provider would not approve of a diet."  (*Id.*) Stallman opted instead to change Dykes's medication.

In September 2020, Dykes sent another medical kite, complaining of the same symptoms from January that year.  (*Id.* ¶ 25.)  Eventually, Wendy Ball, a nurse manager who was previously terminated from this action (ECF No. 9), examined Dykes and ultimately forwarded his kites to Defendant Wellman, an MDOC dietician.

Dykes alleges that Wellman responded "with a misunderstanding of [the] kite" and incorrectly assumed that he was requesting a vegan diet.  (Compl. ¶ 26.)  He attempted to correct her with an additional kite, explaining that he "was asking for a soy and bean free diet."  (*Id.* ¶ 27.) Wellman responded that "MDOC does not provide diet trays to accommodate individual food intolerances" and denied his request.  (*Id.*)  Dykes alleges that Wellman "ignored the fact that I was on medication for the symptoms."  (*Id.*)

Dykes then filed a grievance.  (*Id.* ¶ 28.)  In response, Stallman ordered medical tests to determine the cause of Dykes's gastrointestinal symptoms and lethargy.  According to those tests, Dykes has a condition known as G6PD[1] deficiency.  Stallman recommended Dykes "stay away from soy, and beans" and provided him with an informational flier.  (*Id.* ¶ 29.)  Dykes did not receive an alternative diet.  In a declaration attached to his response to Jamros's summary judgment motion, Dykes avers that he was seen by Stallman and Jamros at least three more times—twice in

---

[1] G6PD stands for glucose-6-phosphate dehydrogenase.  (*See* G6PD Flier, ECF No 1-12.)

August 2021 and once in October.  (Decl. in Resp. to Jamros Mot. for Summ. J. ¶ 3, ECF No. 85-1.)

Dykes also names Defendant Willard, who he alleges created and is responsible for the vegan diet.  (*Id.* ¶ 31.)  Dykes has apparently been on the vegan diet since 2019 when it was authorized for him as a religious accommodation.  (*Id.* ¶ 47.)  He complains that the vegan menu is medically inadequate because it "does not provide substitutions for soy."  (*Id.* ¶ 31.)

**B. Religious Diet**

Separate from his alleged diet-related medical issues, Dykes also claims to have "been requesting a diet that comports to [his] sincerely held religious dietary needs, in writing[,] since 2016."  (*Id.* ¶ 32.)  More specifically, he has been a member of the Moorish Science Temple of America since 1991.  This religion does not specify a particular "dietary program" but rather "le[aves] it up to the individual's own conscience."  (*Id.* ¶ 39.)

Dykes claims that he first studied and adopted the Buddhist diet in 2011 and then adopted the Nation of Islam diet in 2015 (after the MDOC had replaced the Buddhist diet with an all-purpose vegan diet).  (*Id.* ¶¶ 41-44.)  He requested a Buddhist diet in 2011, 2012, 2014, and 2015—none was approved.  After he adopted the Nation of Islam diet, he again "placed the MDOC on notice of [his] dietary requirements," explaining that he could not eat "soy, peanut butter, all beans (except navy beans), corn, corn bread, grits[,] and greens."  (*Id.* ¶ 45.)  He requested a conforming diet each year from 2016 to 2019.

In 2019, following his religious meal accommodation request, a non-party MDOC chaplain interviewed Dykes about his religious beliefs.  Dykes was then placed on a vegan religious diet by Special Activities Coordinator ("SAC") Adamson.[2]  (*Id.* ¶¶ 46-47.)  This diet, however, "consisted

---

[2] Adamson was terminated from this action along with Bell.  (*See* 7/22/2022 Order.)

of 90% soy, beans, greens, corn, peanut butter, and corn bread"—all ingredients Dykes claims

violated his religious dietary restrictions.  (*Id.* ¶ 47.)  He immediately requested an alternative diet

but was denied per an MDOC policy that only allows one religious diet request per year.

The next year, Dykes again requested an alternative diet.  He was again interviewed and

again communicated his specific dietary needs.  Ultimately, Defendant Dirschell issued a

recommendation to Defendant Bush to deny Dykes's request, which Bush adopted.  Dirschell's

recommendation to Bush makes clear that he recommended denial based on Dykes's conflicting

commissary purchases (2021 Dirschell Recommendation, ECF No. 67-3, PageID.589).  Dykes

alleges that he received Bush's ultimate denial without explanation.  (Compl. ¶¶ 48-49.)  Dykes

notes that at some point prior to the denial of this alternative diet request, he was reprimanded by

the chaplain for purchasing foods from the commissary that did not conform with his stated

religious beliefs.  (*Id.* ¶ 50.)  He maintains that he purchased this food for bartering purposes only.

(*Id.* ¶ 56.)

Finally, in 2022, Dykes again submitted a request for an alternative diet.  The request was

sent to Dirschell who again recommended denial based on conflicting commissary purchases.

(2022 Dirschell Recommendation, ECF No. 67-3, PageID.605.)   Bush again denied Dykes's

request, allegedly without explanation.  (Compl. ¶¶ 51-52.)

### III. JOINT SUMMARY JUDGMENT MOTION—DEFENDANTS WELLMAN, WILLARD, DIRSCHELL, AND BUSH

The magistrate judge reached the following conclusions with respect to Wellman, Willard,

Dirschell, and Bush's joint summary judgment motion:

1. Dykes's First and Eighth Amendment claims against Defendants Willard, Dirschell, and Bush in their <u>official capacities</u> fail because Dykes did not allege that a policy or custom of the MDOC acted as a moving force behind the violation of his constitutional rights;

6

2. Dykes's <u>personal capacity</u> claims against Willard under the First and Eighth Amendment, and against Dirschell and Bush under the Eighth Amendment fail because the officials were not personally involved in the alleged violation of those rights;

3. Dykes's <u>personal capacity</u> Eighth Amendment claim against Wellman fails because the evidence on the record establishes that Wellman did not act with deliberate indifference to his dietary needs, but rather considered whether he was receiving adequate nutrition and counseled him on acclimating to a high-fiber diet;

4. Dykes's <u>personal capacity</u> First Amendment claims against Dirschell and Bush fail because their denial of his alternative diet was based on Dykes's history of purchasing foods that did not conform with his alleged religious beliefs, which was reasonably related to the penological interests of controlling costs and maintaining discipline; and

5. Dykes's RLUIPA claims against Defendants fails because the denial of his alternative diet request was not permanent, and therefore did not substantially burden the exercise of his religion.

(2/7/2024 R&R 3-4.)  Dykes lodges several objections.

## A. General Objections

Dykes makes two general objections.

### 1. Objection One

Dykes avers that Defendants failed to seek a concurrence on their motion for summary judgment as required by local rule 7.1(d).  He cites *Yetman v. CSX Transportation, Inc.*, No. 1:08-cv-1130, 2009 WL 35351 (W.D. Mich. Jan. 6, 2009) for the proposition that "'[t]he remedy for failure to seek concurrence under the local rule 7.1(d) is denial of the motion without prejudice.'" (Pl.'s Objs. to 2/7/2024 R&R 1 (quoting *Yetman*, 2009 WL 35351, at *1).)  First, the Court cannot locate the quote Dykes uses in his *Yetman* citation.  Additionally, that case involved a plaintiff's failure to seek concurrence on a voluntary motion to dismiss—significantly different than a summary judgment motion.  Second, local rule 7.1(d) provides that the "Court *may* impose sanctions . . . , which may include . . . denying the motion[.]"  W.D. LCivR 7.1(d)(iii) (emphasis

added).  The local rules do not *mandate* denial, and the Court declines to so order here.  Dykes's first objection will be overruled.

### 2. Qualified Immunity

The magistrate judge concluded that Defendants were entitled to qualified immunity because no constitutional violations occurred.  In other words, the qualified immunity outcome was "largely redundant" with the constitutional outcomes.  (2/7/2024 R&R 32.)  Dykes objects to this conclusion, but makes no immunity-specific argument.  Because the Court ultimately agrees with the magistrate judge's conclusions that no constitutional violations occurred, Dykes's qualified immunity objection will be overruled.

### B. First Amendment and RLUIPA Objections

Dykes makes several objections related to the religious exercise component of his complaint.

### 1. Objection Two

Dykes argues that the magistrate judge inappropriately resolved a factual dispute when he concluded that Willard was not personally involved in the decision to deny Dykes his preferred religious meal.  But there is no material factual dispute.  All Dykes alleges with respect to Willard is that she was "the dietician consultant for the MDOC who created or authorized the vegan diet/menu, failing to provide a substitute for the soy[.]"  (Compl. ¶ 62.)  Willard does not dispute this; rather, she avers that she never met or corresponded with Dykes, that she never worked at a facility where Dykes was held, and that she was never personally involved in Dykes's dietary decisions.  (Willard Aff. ¶¶ 4-8, ECF No. 67-4.)

Taking as true Dykes's undisputed allegation that Willard created the vegan menu for the MDOC, Dykes has failed to adduce evidence from which to infer that Willard personally violated his constitutional rights.  The creation of a general vegan meal for the MDOC does not violate the

constitutional rights of every prisoner for whom the meal is religiously or medically insufficient. In fact, the MDOC's policy provides that "[a] prisoner who believes the Vegan menu does not meet their religious dietary needs may request an alternative menu." (Policy 05.03.150 ¶ OO, ECF No. 67-6.) Dykes does not allege that Willard was involved in any subsequent "alternative menu" request. Dykes's second objection will be overruled.

### 2. Objection Three

Dykes's third objection rests on a mischaracterization of the R&R. He notes, incorrectly, "The magistrate recommend[ed] that Dirschell be granted summary judgment on the lack of personal involvement . . . ." (Pl.'s Objs. to 2/7/2024 R&R 5.) But the R&R does not recommend granting Dirschell summary judgment on those grounds. Rather, the magistrate judge acknowledged that Dirschell did not have the final say over Dykes's religious meal request *but assumed* for the sake of analysis that Dirschell's recommendation to Bush was sufficient personal involvement. In other words, the magistrate judge analyzed Dirschell and Bush's conduct together and found that their denial of Dykes's request did not violate his First Amendment or RLUIPA rights. Because he objects to a line of reasoning the magistrate judge did not adopt, Dykes's third objection will be overruled.

### 3. Objection Four

The magistrate judge acknowledged that "there is a dispute as to the sincerity of Dykes's religious dietary beliefs[,]" but nevertheless concluded that such dispute "is immaterial under the circumstances presented." (2/7/2024 R&R 26.) Dykes apparently takes this to mean that the magistrate judge disregarded his religious beliefs, but again Dykes is mistaken. The magistrate judge *assumed* the sincerity of Dykes's religious beliefs when analyzing his First Amendment and RLUIPA claims. This inference helps Dykes. The R&R does not recommend granting summary judgment to Defendants based on insincerity; thus, Dykes's fourth objection will be overruled.

### 4. Objection Five

Dykes next "contends that Defendant Bush is not entitled to summary judgment for the same reasons he asserted above [as to Dirschell]."  (Pl.'s Objs. to 2/7/2024 R&R 7.)  The same reasoning applies to overrule his objection—the R&R does not recommend that Bush be granted summary judgment on the basis of personal involvement or religious insincerity.

Additionally, Dykes raises the procedural argument that "Bush cannot be entitled to summary judgment because he never presented an argument[.]"  (*Id.*)  Dykes's argument is unclear.  Bush joined the summary judgment motion along with Defendants Wellman, Willard, and Dirschell.  Their arguments are his arguments.  Perhaps Dykes means that Bush did not submit an affidavit along with the motion, unlike the other Defendants.  But Bush's defense does not rest on a factual dispute for which he would need to provide new countervailing evidence.  Rather, Bush's primary defense is that he had a valid reason for denying Dykes's religious meal accommodation request—Dykes's numerous non-conforming commissary purchases.  Dykes does not dispute he made these purchases.  Rather, he asserts that the commissary purchases did not justify denying his request because he only purchased them for bartering purposes.  This is not the sort of dispute that needs to be resolved by an affidavit—Bush made the appropriate argument in his summary judgment motion, and the magistrate judge agreed.  Dykes's contention that "the magistrate over-stepped his boundaries by making arguments for Defendant [Bush][3]" is incorrect.  (*Id.*)  His fifth objection will be overruled.

### 5. Objections Six and Seven

Dykes's sixth and seventh objections relate to the R&R's substantive First Amendment analysis.  "[W]here an inmate challenges prison policies under the Free Exercise Clause, Supreme

---

[3] Dykes names Dirschell but appears to mean Bush based on the discussion leading up to this statement.  Regardless, the analysis is the same for either Defendant.

Court precedent instructs us to follow the standard formulated in *Turner v. Safley*[.]"  *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (citing *Turner v. Safley*, 482 U.S. 78 (1987)).  A prison policy or regulation "is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.  The Court has identified four factors that are relevant to this determination.  First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  *Id.* at 90 (internal quotation marks omitted).  Second, courts consider whether there are available alternative means of exercising the right.  *Id.* Third is consideration of the accommodation's impact on guards, other inmates, and prison resources generally.  *Id.*  Fourth and finally is whether there are ready alternatives available that fully accommodate the prisoner's rights at a de minimis cost to valid penological interests.  *Id.*

Again, Dirschell and Bush based their denial of Dykes's alternative meal request primarily on his numerous conflicting commissary purchases.  As discussed, the magistrate judge assumed for the sake of analysis that Dykes's religious belief is sincere, and thus that the denial of his meal accommodation request burdened his religious exercise.  He then turned to the first *Turner* factor and found two penological interests that were rationally related to the policy animating the denial: controlling costs in the face of expensive religious meals and maintaining discipline in the prison. (2/7/2024 R&R 28 (citing *O'Connor v. Leach*, No. 1:18-cv-977, 2020 WL 838084, at *3 (W.D. Mich. Jan. 27, 2020); *Ewing v. Finco*, No. 1:17-cv-505, 2019 WL 8105992, at *8 (W.D. Mich. Sept. 18, 2019); *Perreault v. Mich. Dep't of Corr.*, No. 1:16-cv-1447, 2018 WL 3640356, at *3 (W.D. Mich. Aug. 1, 2018)).)   Turning to the remaining factors, the magistrate judge acknowledged that "Dykes cannot rely on vegan religious meals alone to provide him with adequate nutrition while observing his alleged religious dietary belief" but nonetheless concluded the *Turner* factors favor Defendants.  (2/27/2024 R&R 28-29.)

11

For factor two, the R&R noted that Dykes could supplement his diet with *conforming* commissary purchases.  For factor three, the R&R noted the "significant[] impact" on prison resources that would flow from approving inmates' individualized diets while simultaneously allowing them to purchase non-conforming foods from the commissary.   Finally, for factor four, the magistrate judge noted that Dykes did not point to a ready alternative available at a de minimis cost to penological interests.

Dykes makes two main objections to the magistrate judge's *Turner* analysis.  He argues in objection seven that the cost justification (for factor one) was inappropriately raised by the magistrate judge, rather than Defendants, and that it is unsupported by evidence.  He argues in objection six that the availability of commissary purchases (for factor two) was also inappropriately considered and unsupported by evidence.

Dykes's objection to the factor one analysis is unpersuasive.  Defendants did raise cost as a justification in their brief by citing and discussing other district court opinions that relied on that justification.  Dykes had the opportunity to counter that justification or distinguish his case but failed to do so.    Thus, this argument was sufficiently raised and appropriately considered by the magistrate judge.  Further, this very justification has been cited by numerous district courts.  *See, e.g.*, *Green v. Tudor*, 685 F. Supp. 2d 678, 698 (W.D. Mich. 2010) (upholding a religious meal denial after an inmate purchased non-conforming food from the commissary because "[g]ranting requests for specialized diets would be expensive, diverting resources from other penological goals"); *O'Connor*, 2020 WL 838084, at *3 (same because "[p]rison officials have a legitimate penological interest in controlling the cost of special religious diets"); *Perreault v. Mich. Dep't of Corr.*, No. 1:16-cv-1447, 2018 WL 360356, at *3 (W.D. Mich. Aug. 1, 2018) (same because "[i]t is well recognized that prison officials have a legitimate penological interest in controlling the cost

of special religious diets"). Indeed, the Sixth Circuit has also recognized this justification. *See Berryman v. Granholm*, 343 F. App'x 1, 4 (6th Cir. 2009) ("Prison officials have a legitimate penological interest . . . in controlling the cost of the kosher meal program.").

The Court is satisfied that controlling the costs of religious meals is a valid penological interest. The Court is also satisfied that denying those prisoners who have made conflicting commissary purchases—both before and after requesting an alternative religious meal accommodation—is rationally related to that interest. It is self-evident that prison officials must have *some* way of sorting through myriad meal accommodation requests. Analyzing conflicting commissary purchases is one rational way to do that, and "courts owe substantial deference to the professional judgment of prison administrators." *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012) (quoting *Beard v. Banks*, 548 U.S. 521, 522 (2006)).

Dykes's objection to the factor two analysis—the availability of commissary items to supplement his religious practice—is also unpersuasive. The second *Turner* factor merely asks whether there are "alternative means" of exercising the asserted religious right as one input into the overall analysis. It is not dispositive. Here, where Dykes complains that he cannot get a full meal from his MDOC-issued meal, it was not error for the magistrate judge to consider other supplemental sources of nutrition.

Although Dykes complains that there is no evidence that he can afford such purchases, the record indicates otherwise. Dykes was denied his alternative religious meal request precisely because he *could* make commissary purchases. In fact, records indicate that he made nearly *weekly* commissary purchases from September 2021 to January 2022 (after his first alternative meal denial and before his second). (2/17/2021 Commissary Report, ECF No. 67-3, PageID.598-604.) Most of the orders were substantial. Many totaled around $100 and included items and quantities such

13

as 15 packs of roast chicken-flavored ramen, 10 plain bagels, and 5 summer sausages.  (*Id.*, PageID.598.)  Dykes admits that he made these purchases.  While he claims to have made these purchases for bartering purposes only, it stands to reason that he could have instead opted to purchase items to supplement his diet.  The magistrate judge was correct to consider this in the *Turner* analysis.

Dykes's sixth and seventh objections will be overruled.

### 6. Objection Eight

With respect to the official capacity claims, Dykes objects to the R&R's conclusion that he failed to allege an MDOC policy or custom that served as the moving force behind a violation of his First Amendment rights.  He now cites MDOC Policy Directive 05.03.150 as the moving force.  But this policy merely sets out how the MDOC handles religious meals—for instance, it provides that "[t]he regular diet menu shall be posted a minimum of one week in advance" so that prisoners "shall be permitted to abstain from any foods that violate their religious tenets."  (Policy 05.03.150 ¶ NN.)  It also sets out the request and approval process for those seeking to be placed on the universal religious diet (the vegan menu) and for those seeking an alternate menu.  (*Id.* ¶ OO.)  It also clearly lays out the consequences that follow from "possess[ing] or consum[ing] food that violates a tenet of their designated religion."  (*Id.* ¶ SS.)

This policy does not itself violate the constitutional rights of prisoners.  To the contrary, it provides multiple avenues by which a prisoner may receive meals that conform with his religious beliefs.  It explains the parameters of how and when a prisoner will be approved or denied accommodation.  There are no facially unconstitutional issues with the policy, nor has Dykes identified a constitutional violation in his specific case.  His eighth objection will be overruled.

14

### 7. Objections Nine, Ten, and Fourteen

Objections nine, ten, and fourteen focus on the magistrate judge's RLUIPA analysis. The RLUIPA analysis differs from the First Amendment analysis—"RLUIPA provides greater protection" if the burden is "substantial." *See Holt v. Hobbs* 574 U.S. 352, 357 (2015). The relatively deferential *Turner* analysis is not used. Rather, RLUIPA's "inquiry asks whether the government has substantially burdened religious exercise" and, if so, whether the government can "demonstrate that [a] compelling interest is satisfied through application of the challenged law 'to the person[.]'" *Holt v. Hobbs*, 574 U.S. at 361, 363 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)).

Here, the magistrate judge concluded both that the MDOC's policy was not a substantial burden on Dykes's sincere religious exercise and that, even if it were, the policy was the least restrictive means of furthering a compelling governmental interest. In concluding that the policy was not a substantial burden, the R&R focused on the temporary nature of the religious meal denial. Indeed, individuals who are denied accommodation may reapply after one year. (Policy Directive 05.03.150 ¶ PP.) Other courts agree—"cases where a substantial burden has been found involve a *permanent* prohibition." *O'Connor v. Leach*, No. 1:18-cv-977, 2020 WL 2187814, at *2 (W.D. Mich. May 6, 2020) (emphasis added) (collecting cases); *see also Resch v. Rink*, 2:21-cv-227, 2022 WL 794849, at *4 (W.D. Mich. Mar. 16, 2022) (collecting cases). Further, the magistrate judge cited *Perreault* for its conclusion that denying a religious meal accommodation when a prisoner was "contemporaneously purchasing food items which were inconsistent with the religious meal accommodation he was requesting" was the "least restrictive means of furthering compelling governmental interests." *Perreault*, 2018 WL 3640356, at *3-4.

Dykes's ninth objection focuses on the substantial burden determination—he argues that permanence should not matter and that, even if it did, he has been denied his accommodation

request for 8 years. As an initial matter, Dykes's earlier denials are not at issue in this case. Here, as discussed in more detail below, Dykes cannot complain that he does not know how to change his behavior to meet prison policies. The reason for both his 2021 denial and his 2022 denial is a simple command to follow—stop purchasing items inconsistent with your religious accommodation request. The MDOC policy explicitly provides mechanisms to be placed back on the religious meal plan in the event of being removed due to a prohibited item violation and explicitly allows a prisoner to re-apply every year if they are denied a religious meal plan. (Policy Directive 05.03.150 ¶¶ PP, SS.) But Dykes continued to purchase non-conforming commissary items after his 2021 denial and was thus denied in 2022. This does not indicate a permanent burden on his religious exercise; instead, it indicates an unwillingness of Dykes to prioritize his religious practice in favor of repeatedly flouting prison rules.

His tenth objection appears to focus on the policy itself. The Court will construe this as an objection to the magistrate judge's conclusion that the policy of denying religious meal requests in the face of conflicting commissary purchases is the least restrictive means of furthering a compelling governmental interest. Dykes relies on an unpublished Sixth Circuit opinion, *Ewing v. Finco*, Nos. 20-1012, 20-1022, 2021 U.S. App. LEXIS 182 (6th Cir. Jan. 5, 2021). There, the Sixth Circuit appeared to cast doubt on the policy of denying religious meal accommodation requests when "there [is] no evidence that the plaintiffs were put on notice that their prior purchases would be considered in obtaining approval for religious meals or that they were given an opportunity to explain those purchases." *Id.* at *8. Critically, the Sixth Circuit's reasoning focused on notice. It did not hold that the policy violated RLUIPA. Nor did it hold that commissary purchases are categorically excluded from consideration—indeed, it noted that "[t]here is no

16

dispute that a prisoner, once approved for religious meals, is prohibited from possessing food items forbidden by the teaching of the prisoner's religion." *Id.*

Here, Dykes's contention that he was not put on notice of the MDOC's practice rings hollow. Dykes's first request at issue was submitted on October 21, 2020. (10/21/2020 Kite, ECF No. 1-13.) His second was submitted on February 1, 2022. (Compl. ¶ 51.) The Sixth Circuit decided *Ewing* on January 5, 2021, overturning the district court's opinion in *Ewing v. Finco*, No. 1:17-cv-505, 2019 WL 6485869 (W.D. Mich. Dec. 3, 2019). Critically—*Dykes was a plaintiff in Ewing.*[4] In the lower court's opinion, it noted "Dykes asserts that he was not aware that his purchase of sausages could be used as a basis for denying his meal request." *Ewing*, 2019 WL 6485869, at *1. Dykes and his fellow plaintiffs won on that notice issue. Clearly, Dykes was aware in 2020 (and 2022) that the MDOC would review his commissary purchases *before* approving his request because he was arguing that he lacked notice of the same thing in 2019. He had the opportunity to discontinue purchasing non-conforming items once he received notice of the MDOC's practice; he chose not to do so.

Finally, Dykes's fourteenth objection largely reiterates the objections contained in his ninth and tenth objections. The only additional point Dykes makes is with respect to Defendant Willard. He argues it was inappropriate for the magistrate judge to dismiss a RLUIPA claim against Willard because she never raised the issue herself. But as with objection two, Dykes has failed to allege any facts from which to infer Willard was involved in any religious meal accommodation request denial. The magistrate judge was correct to grant her summary judgment on those grounds.

---

[4] In both case captions, Dykes is identified by his MDOC number, #201541. Further, Dykes writes his full name on various court filings in both cases as "Robert L. Dykes-Bey." The Court takes judicial notice of this fact as one that "is generally known within the trial court's territorial jurisdiction" and one that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(1), (2). The Court "may take judicial notice on its own[.]" *Id.* 201(c)(1).

At bottom, the Court agrees with the magistrate judge's conclusion that Dykes's religious practice was not substantially burdened because the denial was temporary and ultimately in his own control.  He was on notice of how to alter his behavior to receive approval of his religious meal request.  Further, the Court agrees that the MDOC's policy of considering commissary purchases is the least restrictive means of furthering a compelling governmental interest in controlling costs.  Dykes's individual situation is indicative of the problem the MDOC faces. Dykes was placed on the universal religious diet (the vegan diet) but was dissatisfied with the particulars of that diet.  He thus sought a very particularized diet—one free of meat but also one free of common components of a meat-free diet.  He sought this particularized accommodation while simultaneously purchasing scores of items that conflicted with either or both his existing meal plan and his requested meal plan (for instance, his commissary purchases included both meat and corn products).  This Court shares the court's concern in *Resch*: "[t]aken to its logical conclusion, plaintiff's religious practice theory here could put prison officials in the impossible position of preparing restaurant style, made-to-order plates for each inmate.  Neither the First Amendment, RLUIPA, the Eighth Amendment or any other theory of which this Court is aware requires that." *Resch*, 2022 WL 794849, at *5.  Dykes asks the Court to place the MDOC in this difficult position without a demonstrated willingness to alter any of his own conflicting practices. The Court will not sanction this deeply inconsistent outcome.  Dykes's ninth, tenth, and fourteenth objections will be overruled.

### C.  Eighth Amendment Objections

Dykes makes several objections related to the Eighth Amendment portion of his complaint.

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component,

the plaintiff must allege that the medical need is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

The Sixth Circuit distinguishes between cases where a complaint alleges complete denial of medical care and those where it claims inadequate treatment.  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attentions and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *Ruster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014).

On a deliberate indifference claim, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  The prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment.  *Napier v. Madison Cnty.*, 2385 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that a prison official has "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).  The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Differences in judgment regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim, even if a misdiagnosis results in an inadequate course of treatment and considerable suffering.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

19

### 1. Objection Eleven

Dykes's eleventh objection again relates to Willard.  He complains that the magistrate judge inappropriately "sided with Defendant Willard" on the basis of personal involvement.  As with the religious meal claims, Dykes has not alleged facts from which a jury could infer that Willard was personally involved in any Eighth Amendment violation.  Creating the vegan meal plan for the MDOC does not constitute deliberate indifference to Dykes's medical needs.  That is true even though the vegan diet, which is high in fiber, can create gastrointestinal issues, especially if not properly hydrated—as Dykes was informed by Wellman.  (Wellman Aff. ¶ 11, ECF No. 67-2.)  Dykes's complaint falls well short of establishing the subjective component of the Eighth Amendment analysis here.  Again, Willard had no interaction with or even knowledge of Dykes—a fact Dykes does not dispute.  His eleventh objection will be overruled.

### 2. Objection Twelve

Dykes's twelfth objection contains several sub-issues but overall concerns the R&R's recommendation that Wellman be granted summary judgment.  The magistrate judge concluded:

> Ultimately, the undersigned is not convinced that Dykes has created a genuine issue of material fact as to whether his gastrointestinal distress or G6PD deficiency, either alone or together, constitute serious medical needs.  But even assuming that he has, the evidence on the record establishes that Dietician Wellman was not deliberately indifferent to the outcome.

(2/6/2024 R&R 18.)

### (a) Evidence and Allegations Against Wellman

A more detailed review of the record is instructive.  There are two documented interactions between Dykes and Wellman.  First, Wellman sent a follow-up kite to Dykes after he was seen by healthcare complaining "about certain items in my diet that is causing extreme gas, frequent bowel movements, and upset stomach[.]"  (10/21/2020 Kite Resp., ECF No. 1-9.)  In that kite, Wellman misunderstood Dykes's request and believed he was asking to be put on the religious/vegan meal

plan.  (*Id.*; Compl. ¶ 26.)  Wellman explained that she was not authorized, as a dietician, to issue a religious meal accommodation.  (10/21/2020 Kite Resp.)

Second, after receiving Wellman's initial response, Dykes's sent her a follow-up request addressing the confusion and clarifying, "I am trying to have the food items [that were causing gastrointestinal distress] substituted for foods I can eat, and was told that you have to make that call, that health care couldn't."  (10/22/2020 Kite, ECF No. 1-10.)  In her response, Wellman acknowledged her misunderstanding, explained the limits of what she could do, and provided a recommendation to deal with the symptoms.  (10/22/2020 Kite Resp., ECF No. 1-11.)  Her response in full was as follows:

> Thank you for clarifying, you are correct that I did misunderstand what you were requesting.  A vegan diet is a very high fiber diet, which does tend to produce the symptoms you are describing especially if you were not used to a high fiber diet prior to starting the vegan diet.  Unfortunately, there are very few changes available for self selection on the vegan diet, changes are limited to the healthy choice options such as fruit in place of desserts.  As I mentioned previously, therapeutic diet changes (substitutions) are not provided to accommodate individual food intolerances.  I would suggest trying smaller portions of the foods that are triggering your symptoms to see if you can find a tolerable threshold, and ensuring that you are drinking plenty of water throughout the day which can help the digestion of a high fiber diet.

(*Id.*)

Wellman's affidavit provides more context for her response.  She avers, "Only a medical provider (defined as a physician, physician assistance, or nurse practitioner) or a dentist can approve a medical order for a therapeutic diet for an MDOC prisoner[,]" and "[a] therapeutic diet is not provided to prisoners unless they have a demonstrable inability to maintain adequate health due to intolerances."  (Wellman Aff. ¶¶ 6-7.)  With respect to Dykes, she explains, "I reviewed his medical history.  I noted that Dykes had gained weight since being on the religious vegan diet.  I did not see any history of food allergies in Dykes's medical record or anything else that would indicate that he was suffering from inadequate nutrition."  (*Id.* ¶ 10.)  Further, her "review of Mr.

21

Dykes's medical and dietary history showed no indication of support for therapeutic diet interventions." (*Id.*)

Dykes's only other mention of Wellman in his complaint is his allegation that "Wendy Ball intentionally disregarded PD-04.07.101 . . . when she forwarded my kite to Kelly Wellman . . . clearly I was suppose[d] to see the MP, not the dietician[.]" (Compl. 54.)  In his response to Defendants' joint summary motion, he claims "the Plaintiff sent a kite to Kelly Wellman requesting a diet free from beans, soy, and peas because of his G6PD condition in June of 2021 (Pl. Decl. attached hereto)." (Pl.'s Resp. to Joint Mot. for Summ. J. 6, ECF No. 69.)  After a review of the record, the Court has no evidence of this June 2021 kite or any resulting response— the declaration attached to the response does not mention this kite (Pl.'s Decl. in Supp. of Resp., ECF No. 69-1.)  And although the summary judgment response is signed, it does not constitute an unsworn declaration made under penalty of perjury; it is thus not evidence.  28 U.S.C. § 1746; *cf. El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).  Furthermore, it is inappropriate to consider new factual allegations raised in a response to summary judgment motion.  Based on the complaint, Wellman had no notice that Dykes would allege an additional interaction and thus had no reason to address the allegation in her summary judgment motion or in discovery.  Because Dykes's medical situation had changed in June 2021—he received his G6PD diagnosis in May 2021—this allegation is potentially material.  Thus, the Court concludes that the only interactions between Dykes and Wellman that may be considered are the two kites from October 2020.

### (b) Eighth Amendment Analysis

*Objective Component.*  The magistrate judge was not convinced that a material dispute of fact exists as to whether Dykes was suffering from a sufficiently serious medical need to establish the objective component.  He based this conclusion on two points: first, Dykes complains almost exclusively of gastrointestinal distress and "courts have rejected indifference claims based on food

intolerances marked by simple gastrointestinal distress."  (2/7/2024 R&R 17 (collecting cases).)
Second, the magistrate judge found that Dykes had submitted insufficient evidence of the
seriousness of the G6PD deficiency. Dykes submitted a flier as evidence of the seriousness—the
magistrate judge found that the flier shows that the deficiency can sometimes be serious (especially
stemming from the consumption of fava beans) but can also be benign.  (*See generally* G6PD
Flier.)  Notably, the deficiency "is the most common human enzyme deficiency; it affects an
estimated 400 million people worldwide."  (*Id.*, PageID.68.)

The Court is less convinced than the magistrate judge that Dykes has presented insufficient
evidence to put in dispute that he was suffering a serious medical need.  The Court must resolve
inferences in favor of Dykes.  Dykes has alleged years of gastrointestinal distress in which he says
he has sometimes had diarrhea for two to three months at a time.  The Court cannot say definitively
that such distress is not a serious medical need.

For instance, Dykes points to case law (in an out-of-circuit district) in which a court noted
that diarrhea is considered "chronic" when it "persists for more than four weeks."  *Cook v. Lain*,
No. 2:10-cv-411-prc, 2013 WL 866876, at *7 (N.D. Ind. Mar. 7, 2013).  Notably, that court
assumed without deciding that such chronic diarrhea could constitute a serious medical need but
decided against the plaintiff on the subjective component.  *Id.* at *17.  The Court finds a similar
path to be prudent here.  To be clear, the Court does not conclude that Dykes was suffering from
a serious medical need—only that Wellman should not be granted summary judgment on this
particular prong.  In this limited regard, the Court will grant Dykes's objections related to the
objective component.

*Subjective Component*.   Regardless of the limited disagreement on the objective
component, the magistrate judge appropriately also considered the subjective component.  Here,

he found that "Wellman's actions do not display deliberate indifferent to Dykes's serious medical needs." (2/7/2024 R&R 19.)  The Court agrees.

First, Wellman did respond to Dykes's request to be placed on a therapeutic diet.  In fact, she responded with suggestions to help manage his symptoms.  Thus, this is a case where Dykes received *some* care and he merely disagrees with the outcome.  This analysis begins as a tougher road for Dykes.

Second, Dykes has not shown that Wellman was aware of facts from which she could infer he faced substantial risk.  Wellman is not a medical provider.  She is a dietitian.  She is only able to ensure a prisoner is receiving adequate nutrition; she is not able to diagnosis a medical issue or order a "therapeutic diet."  She must rely on the medical providers for that—and the medical providers referred Dykes without any such medical issue diagnosed or therapeutic diet ordered. That he was prescribed some medication for gastrointestinal distress does not change this conclusion.  If anything, that strengthens Wellman's case as it indicates that healthcare had evaluated Dykes's gastrointestinal issues and provided treatment that stopped short of ordering a therapeutic diet.

As the Court noted in a previous opinion, "Wellman would have responsibility for ensuring that Plaintiff received adequate calories and nutrition." (7/22/22 Op. 20, ECF No. 8.)  Wellman's affidavit shows that she did just that—for instance, she noted that Dykes was gaining weight.  This is logically consistent with someone receiving adequate nutrition.  She also explained to Dykes his options for substituting food.  And she recommended that Dykes keep his water intake up.  These are all closely associated with Wellman's role as a dietician concerned with Dykes's nutritional intake.  In October 2020, she was not aware of Dykes's G6PD deficiency and, even if she was, she

would not have been able to approve a medical order for a therapeutic diet—again, that is something only a medical provider can do.

Dykes makes numerous objections to these observations.  For instance, he argues that whether gaining weight indicates an individual is receiving adequate nutrition is a question for the jury to resolve.  Not so.  For one, that is not relevant to his claim.  He claims a serious medical need stemming from consuming food causing him gastrointestinal distress—not malnourishment.  Two, Dykes has not proffered any evidence of his own to counter Wellman's.  Third, her observation of his weight gain is merely one component of the care Wellman provided to Dykes.  He clearly disagrees with her refusal to order a therapeutic diet, but even if she could have done so (Dykes has not proffered evidence refuting her assertion that she cannot), this merely evinces a disagreement over the course of medical treatment.  That is insufficient for a deliberate indifference claim.

Wellman had limited facts before her and responded to those facts appropriately.  Dykes has fallen well short of establishing a genuine dispute as to the subjective component of his claim against her.  Dykes's twelfth objection will be overruled.

### 3. Objection Thirteen

The magistrate judge recommends that Defendants Dirschell and Bush be granted summary judgment on Dykes's Eighth Amendment claim because they "were not personally involved with the denial of Dykes's *therapeutic* diet requests."  (2/7/2024 R&R 20.)  Dykes objects to this:

> NOWHERE in the Plaintiff's complaint did he allege that Defendant . . . Dirschell, or Bush deprived him of a medical diet . . . , therefore, the Defendants never put forth a defense against such accusations.  Yet, the magistrate has inappropriately found that the Defendants are not responsible for the deprivation of a medical diet, and therefore, are entitled to summary judgment.

(Pl.'s Objs. to 2/7/2024 R&R 20.)  Dykes's reasoning is circular.  It was not inappropriate for the magistrate judge to conclude that these Defendants are entitled to summary judgment on a claim

for which Dykes himself admits he has not alleged sufficient facts.  The complaint is not entirely clear which constitutional claims Dykes means to assert for which Defendant.  Dykes's thirteenth objection will be overruled.

### D. Joint Summary Judgment Motion Conclusion

For the foregoing reasons and subject to minor qualifications, the Court agrees with the magistrate judge's conclusions contained in the R&R.  The Court will grant these Defendants' their motion for summary judgment.

## IV. JAMROS SUMMARY JUDGMENT MOTION

The magistrate judge recommended denial of Jamros's summary judgment motion because she limited her arguments and evidence to her 2020 medical encounters with Dykes and did not address later encounters.  In other words, the magistrate judge concluded that the Court has insufficient information from which to analyze Dykes's Eighth Amendment claim against Jamros.

Jamros objects, arguing that only the 2020 medical encounters should be properly considered because the later encounters were only submitted as evidence in Dykes's response to Jamros's summary judgment motion.  She also submits a declaration along with her objection that contradicts Dykes's factual allegations.  (Jamros Decl. in Supp. of Objs., ECF No. 91.)

In his complaint, Dykes clearly alleges only one medical encounter between him and Nurse Practitioner Jamros.  That encounter took place in January 2020.  The rest of the complaint contains vague references to his ongoing, years-long complaints of intense gastrointestinal distress and being referred by Bell to medical providers (like Jamros), as well as various references to his encounters with "healthcare."  Understandably, then, Jamros's summary judgment motion was narrowly focused on those medical encounters that took place in 2020.  Notably, she did acknowledge that she saw Dykes on two occasions in 2020 (January 27 and February 2) and denied seeing Dykes in October 2020.  (Jamros Decl. in Supp. of Mot. for Summ. J. ¶¶ 4, 10, ECF No. 64-

26

2).  In other words, her response addressed encounters that were only vaguely insinuated in the complaint.

The only issue here is whether to consider Dykes's summary judgment-stage declaration that he saw "Stallman and Jamros[] approximately ten times (Nov. 2019, Jan, Feb, May, Aug., Oct., and Nov. of 2020, May of 2021, twice in Aug. of 2021, and Oct. of 2021)" and that most of these visits were with Jamros. (Decl. in Resp. to Jamros Mot. for Summ. J. ¶¶ 3-4.)  The Court concludes that it should.

Unlike his assertions of further encounters with Wellman, Dykes has submitted evidence of further encounters with Jamros.  Dykes's response to Jamros's summary judgment is an unsworn declaration made under penalty of perjury.  28 U.S.C. § 1746.  It is therefore properly considered evidence.  *See El Bey*, 530 F.3d at 414.  Further, while Dykes's complaint is not clear that he alleged more than one encounter with Jamros, it is also not clear that he alleged *only one* encounter with her.  Jamros herself listed two additional relevant medical encounters in her summary judgment motion—one in February 2020 and one in October 2020.  And Dykes's complaint could be construed to include allegations that Jamros was involved in his regular medical care—the same cannot be said of Wellman, who's role as a dietician was discussed by Dykes as more limited.

Thus, any confusion as to the scope of Dykes's alleged medical encounters with Jamros was cleared up in Dykes's summary judgment declaration.  Jamros had the opportunity to reply and did not.  The magistrate judge was correct in concluding that he lacked sufficient information to analyze in full Dykes's Eighth Amendment claim.

Jamros has now responded (in her objection) and disputes Dykes's assertions.  She avers, "I evaluated and treated Plaintiff Robert Dykes on the following dates: January 27, 2020, February

2, 2020, August 6, 2020, August 7, 2020, and October 27, 2020[,]" and that "[m]y last encounter

with Mr. Dykes occurred on October 27th."  (Jamros Decl. in Supp. of Obj. ¶¶ 4, 10.)  Considering

Jamros's late declaration, just as the Court is considering Dykes's late declaration, the Court

cannot conclude that no material dispute of fact exists.  Dykes submits testimonial evidence that

he was seen by Jamros in 2021; Jamros submits testimonial evidence that he was not.  This dispute

is potentially material because the 2021 dates are after Dykes's diagnosis with G9PD deficiency.

The Court cannot resolve this factual dispute, and it would be inappropriate to draw inferences

against Dykes at this stage.  The Court has insufficient evidence to evaluate the seriousness of this

condition, whether Jamros knew of this condition, and whether her response, if any, was adequate.

Jamros's objection will be overruled.   However, the Court will delay adopting the

magistrate judge's recommendation in full for consideration of an ancillary issue that results from

the foregoing analysis.  Although neither the magistrate judge nor Jamros raised this specific point,

the magistrate judge's conclusion does create a lingering issue—exhaustion.  The Court previously

concluded that Dykes successfully exhausted his claims against both Jamros and Stallman.

(3/27/2023 Order Approving R&R, ECF No. 39.)   However, that order covered only 2020

encounters with respect to Jamros.  (*See* 2/13/2023 R&R 9, ECF No. 32.)  In contrast, the order

explicitly covered encounters in both 2020 and 2021 with respect to Stallman.  Because the claims

against Jamros have been clearly extended to 2021 for the first time, Jamros should have the

opportunity to assert an exhaustion defense in the first instance.

Thus, the Court will order supplemental briefing on the issue of exhaustion for the 2021

claims against Jamros.  The Court stresses to all parties that any briefing should be limited to the

narrow issue of medical encounters between Jamros and Dykes in 2021.

## V. STALLMAN DEFAULT JUDGMENT MOTION

Dykes seeks entry of default judgment against Stallman.  He applied for default on January 29, 2024, which the clerk of court denied (ECF No. 76).  He simultaneously moved for default judgment (ECF No. 79).  In the R&R entered February 5, 2024, the magistrate judge recommended that this Court decline to enter both default and default judgment against Stallman.  The magistrate judge concluded that he "cannot yet conclude that [Stallman] has stopped defending the case.  Dr. Stallman was not required to file a dispositive motion or any other pleading during his period of inactivity.  And Dykes does not contend let alone establish that Dr. Stallman failed to participate in discovery."  (2/5/2024 R&R, 5-6.)

There are several reasons to reject Dykes's default and default judgment requests, all of which were appropriately cited by the magistrate judge.  First, 42 U.S.C. 1997e(g)(1) provides that "[a]ny defendant may waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983[.]"  Second, this Court in an earlier order explicitly stated, "Until so ordered by the Court, no Defendant is required to file an answer or motion in response to the complaint, and no default will be entered for failure to do so."  (Order Lifting Stay 3, ECF No. 14.)  The Court has not since "so ordered."  Third, Stallman has previously appeared.  (*See, e.g.*, Mot. for Summ. J. on Basis of Exhaustion, ECF No. 16.)

Dykes makes two objections—both are unpersuasive.  First, he objects to the magistrate judge ruling on the motion for default judgment, claiming that he did not move the Court to ask for default judgment but rather that he requested the clerk to enter default judgment.  Second, he argues that default judgment should be entered by the clerk because Stallman has failed to defend.

Dykes misunderstands the default judgment process.  If the amount in controversy is for a sum certain, the clerk may enter default judgment in one specific instance—"against a defendant who has been defaulted *for not appearing*."  Fed. R. Civ. P. 55(b)(1) (emphasis added).  That is

not the case here.  One, default was *not* entered.  Two, Stallman has appeared.  Thus, the clerk *could not* enter default judgment even if it had entered default.  Dykes must apply to the Court for a default judgment.  Fed. R. Civ. P. 55(b)(2).

Further, Dykes has not convinced the Court that either default or default judgment is appropriate.  For the reasons stated above, Dykes has failed to meet his burden to show a failure by Stallman to defend.  Stallman previously appeared and asserted a defense (albeit one he lost), Stallman was not required to file an answer to the complaint, and Dykes has not shown that Stallman has failed to participate in discovery.  It would be inappropriate to enter default against Stallman in these circumstances.

Dykes's objections will be overruled, and the Court will adopt the magistrate judge's recommendation.

## VI. CONCLUSION

An order will enter consistent with this Opinion.

Dated: May 28, 2024                          /s/ Hala Y. Jarbou
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE